ADOLPH BUCCHI *v.* ROGER F. GLEASON, ADMINISTRATOR (ESTATE OF ALICE M. JUDD) ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued April 11—decided June 6, 1950

*Margaret P. Camp* and *Edward B. Scott,* with whom, on the brief, was *Mortimer H. Camp,* for the appellant (plaintiff).

*Leo V. Gaffney,* for the appellant (defendant Pyle).

*Jacob Schwolsky,* with whom was *Henry J. Goldberg,* for the appellee (defendant Goddard).

*Paul G. Cavaliere,* with whom, on the brief, was *Algert F. Politis,* for the appellee (named defendant).

O'SULLIVAN, J. The complaint is in two counts. By the first the plaintiff seeks to recover the reasonable value of services claimed to have been performed for the named defendant's decedent, Alice M. Judd, under an alleged agreement to compensate him by her will. The second count seeks equitable relief which, in effect, would require the defendant Mrs. Theo L. Pyle to return to the defendant administrator the personalty and realty received from Mrs. Judd during her life, on the ground that these transfers have rendered the decedent's estate insufficient to provide for the payment to which the plaintiff is entitled under the first count. Shortly after the return day, the court, upon motion, ordered that Stanley Goddard, a brother of Mrs. Pyle, be joined as codefendant. The answers of all three

defendants were in the nature of general denials. Goddard filed with his answer a counterclaim setting forth that the gifts received by his sister were induced by undue influence practiced upon the decedent, and, as relief, he sought their return to the decedent's estate. The case was tried to the court. Judgment was entered on the complaint in favor of all defendants, and, except as to the realty involved, in favor of Goddard on the counterclaim. The plaintiff and Mrs. Pyle have taken separate appeals to this court.

The finding, which is attacked in each appeal but which is not subject to material correction, discloses these facts: The plaintiff went to work for Rollin D. Judd in 1922. There he remained until Judd died in 1929. A few days before his impending death, Judd obtained a promise from the plaintiff that he would remain in Mrs. Judd's employ as long as she lived. The plaintiff did as he had promised, working for Mrs. Judd as a gardener, chauffeur and handyman. While in her employ, he occasionally took on other part-time jobs for various people. This was done with her knowledge and consent, but this additional work was always subordinate to her right to have first call upon his time. Originally, Mrs. Judd paid him $28 weekly. Later, she increased this wage to $30. On several occasions she presented him with a yearly bonus of $100. During his employment she gave him $1100 to buy two accordions for his children. This sum with others received by him from time to time made a total of about $1450 which Mrs. Judd paid him in excess of his regular wage. On many occasions, she told the plaintiff that she was not paying him enough but that she would see he was well paid at her death. He believed she would do so. He rendered at all times loyal and faithful service to her.

In 1931, Mrs. Judd told the plaintiff that she had left

him $1000 in her will. Two years later, she executed another will in which she bequeathed to him $3000 and her automobile. She informed the plaintiff of these bequests. In 1941, she made a third will wherein she devised to the plaintiff the home in which she lived and bequeathed to him $5000 ·and her automobile. Previous to executing the will, Mrs. Judd had told him of these contemplated testamentary gifts and had asked him if he was satisfied with them. He replied that he was. Each of the three wills she had executed up to this time provided for only a small legacy to her niece, Mrs. Pyle.

On August 15, 1944, Mrs. Pyle, who had been living in Florida, came to New Britain at her aunt's request. This request was prompted by the fact that Mrs. Judd's housekeeper was obliged to leave. Upon her arrival, Mrs. Pyle took over the management of Mrs. Judd's household. At the end of six weeks, Mrs. Pyle discharged the plaintiff. He was never thereafter permitted to enter the house or speak to Mrs. Judd alone.

For many years, Mrs. Judd's financial affairs had been cared for by a local bank, and, from 1940 on, under a general power of attorney. She owned her own home, which was worth $13,000, government bonds of the value of $15,000, cash and bank deposits in excess of $10,000, an automobile and personal effects of substantial value.. She was also the beneficiary of an annuity under which she was entitled to receive $325 monthly as long as she lived.

Three weeks after her arrival in New Britain, Mrs. Pyle received from Mrs. Judd a deed of the house. This conveyance was made in consideration of Mrs. Pyle's written agreement to care for Mrs. Judd and act as her companion for the rest of her life. On September 27, 1944, Mrs. Judd revoked the power of attorney held by the bank, and Mrs. Pyle told the bank's

representative that she would henceforth handle her aunt's finances. On October 9, 1944, Mrs. Judd gave her niece a power of attorney, and from that date on Mrs. Pyle took complete charge of all of her aunt's financial affairs. Between the last mentioned date and the following February, the bank accounts and government bonds were changed so as to make them payable to Mrs. Judd and Mrs. Pyle, or the survivor. On February 13, 1945, Mrs. Judd destroyed her will and at the same time executed a memorandum by which she attempted to give all of her personal property to Mrs. Pyle.

From August, 1944, until her death in December, 1946, Mrs. Judd was at times mentally confused, forgetful, suffering from infirmities of age and readily susceptible to suggestion. She died intestate, leaving as her only asset five shares of stock valued at $500. Her death was attributed to generalized causes, with arteriosclerosis and paralysis agitans specified. The named defendant is the administrator on her estate.

Upon these facts, the court concluded that there was no basis for a finding that Mrs. Judd agreed to compensate the plaintiff by her will, and that she had paid him compensation, while he was in her employ, which was not less than his services were reasonably worth. It further concluded that the personalty which Mrs. Pyle received from her aunt was acquired through undue influence. It entered judgment on the complaint against the plaintiff. On the counterclaim, the judgment incorporated an order that Mrs. Pyle turn over to the administrator on Mrs. Judd's estate all of the personalty received as gifts and, further, that she render an account.

We first dispose of the assignment of errors raised in Mrs. Pyle's appeal. As indicated above, the facts found have ample support in the evidence, and those

which Mrs. Pyle seeks to incorporate in the finding, even if added, would not affect the result. *Watrous* v. *Sinoway*, 135 Conn. 424, 428, 65 A. 2d 473; *Yantz* v. *Dyer*, 120 Conn. 600, 602, 181 A. 717.

Another assignment challenges the court's conclusion that Mrs. Pyle obtained the gifts in question by exerting undue influence upon her aunt. "Any influence brought to bear upon a person . . . consenting to a disposal of property, which, having regard to the age and capacity of the party, the nature of the transaction, and all the circumstances of the case, appears to have been such as to preclude the exercise of free and deliberate judgment, is considered by courts of equity to be undue influence, and is a ground for setting aside the act procured by its employment." Pollock, Contracts (8th Eng. Ed.) p. 640; *Preston* v. *Preston*, 102 Conn. 96, 109, 128 A. 292. The ultimate question before the court was whether Mrs. Judd's mind was so dominated by Mrs. Pyle as to prevent the exercise of an independent judgment. The burden of proof rested on Goddard. *Sullivan* v. *Clear*, 101 Conn. 603, 612, 127 A. 14. Such burden is not ordinarily met by direct and positive evidence. When it is sustained, it is usually owing to proof by logical and reasonable inferences from all the facts and circumstances of the case. *Collins* v. *Erdmann*, 122 Conn. 626, 632, 191 A. 521; *Hills* v. *Hart*, 88 Conn. 394, 397, 91 A. 257; *Dale's Appeal*, 57 Conn. 127, 134, 17 A. 757.

The conclusion of the court that Mrs. Pyle unduly influenced her aunt was reasonable and logical. The speed with which she acted and the totality of her operations are impressive. Within a matter of weeks she received from Mrs. Judd all but $500 of the latter's assets. She kept her aunt in practical isolation from friends and former confidants. At this time Mrs. Judd was frequently confused and forgetful. The infirmi-

ties, both mental and physical, of which her advanced age was the cause rendered her an apt subject for a scheming woman, who, unfortunately, was in a most advantageous position to exercise undue influence. The court had the further advantage of reading several letters written by Mrs. Pyle to her brother Goddard. In them she related some of her activities in language of a most damaging nature. For example, in one she said, "I've tried to fix things so as to get everything for the best for you & I." Again she wrote, "If I could only find the certificates for that bank stock we'd be O.K. without going to probate court." In another letter she said that she was going to keep Mrs. Judd's "checking acct drawn out & put it in [Mrs. Pyle's] name in a savings acct." The evidence as to the issue of undue influence was such as thoroughly to justify the court in the conclusion it reached.

Mrs. Pyle also assigns as error seven rulings on evidence made while she was under cross-examination as to the contents of four letters she had written. These letters, from two of which we have quoted, were material upon the issue of undue influence. The evidence was relevant as admissions which were inconsistent with her denial of undue influence. *Davis* v. *Greenstein*, 112 Conn. 530, 535, 153 A. 161; *Tappan* v. *Knox*, 115 Conn. 508, 517, 162 A. 7.

The final claim made by Mrs. Pyle consists of an attack on the court's order citing her brother to appear as a codefendant. She seeks to have added to the finding that the order was passed "over strenuous objection of both the plaintiff and the defendant, Theo L. Pyle." As this presents a problem involving facts outside the record, it should have been presented by proceedings to rectify the appeal. Practice Book § 365; Conn. App. Proc. § 141. We cannot consider it.

We now turn to the appeal of the plaintiff. The

court reached the conclusion that there was no agreement on Mrs. Judd's part to compensate the plaintiff by her will. It further concluded that the compensation paid to him by Mrs. Judd, while he was in her employ, was not less than the reasonable value of the services performed. Whatever merit there may be in the assignment of error attacking the first conclusion is dissipated by our view of the second.

If we assume that the plaintiff and Mrs. Judd entered into the claimed agreement, her failure to comply with her promise would entitle him to recover no more than the reasonable value of the services he performed. *Spurr's Appeal,* 116 Conn. 108, 111, 163 A. 608. On conflicting evidence as to the extent of the work he had done, the court concluded that he had been paid what his services were reasonably worth. Every week he received the amount of salary agreed upon. In several of the years he was given a bonus of $100. In all, Mrs. Judd paid him $1450 above his specified salary. That she may have intended to be more generous by her will and he may have expected her to do so is immaterial. He could recover, for her breach, only the reasonable value of his services. For these Mrs. Judd had already paid him. *Yantz* v. *Dyer,* 120 Conn. 600, 605, 181 A. 717.

There is no error.

In this opinion the other judges concurred.